# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT (HARTFORD)

| | |
|---|---|
| LEMBERG LAW, LLC | : CASE NO. 3:15-CV-00737 (MPS) |
| : | |
| Plaintiff | : |
| | : |
| vs. | : |
| | : |
| TAMMY HUSSIN AND THE HUSSIN LAW | |
| OFFICES, P.C.,                          : | |
| Defendants | :        SEPTEMBER 18, 2015 |

The Defendants, Tammy Hussin and The Law Office of Tammy Hussin, P.C., herein file their ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM to the Complaint as follows:

## ANSWER

1.    Admitted.

2.    Admitted.

3.    The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

4.      The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

5.      The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

6.      The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

7.      The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

8.      The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

9.      Defendants deny to the extent Plaintiff has a stellar reputation. As to the remaining allegations, the Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

10.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

11.     Defendants admit that Hussin is a California attorney and that she resides in San Diego, California. As to the balance of the paragraph, the Defendants deny Hussin was a contract attorney for Plaintiff.

12.     Admitted.

13.     Denied to the extent that Hussin worked for Lemberg as a contract associate. Admitted as to the balance of the paragraph.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

19.     The Defendants lack sufficient knowledge or information upon which to form a belief as to the first sentence and therefore leaves plaintiff to its proof. Defendants deny to the extent clients view themselves, and are treated as, clients of Lemberg Law.

20.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

21.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

22.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

23.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

24.     Denied to the extent Plaintiff created California state specific templates, manuals and proprietary documents. The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

25.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

26.     Denied as to Plaintiff's allegation it is proprietary business information. To the extent Plaintiff claims valuable business asset, Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof

27.     Denied.

28.     Denied.

29.     Denied as to Plaintiff providing of-counsel attorneys with a handbook, and upon information and belief Hussin was never provided with a handbook. As to the remaining paragraph, the Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

30.     Admitted that in or about February, 2014 Hussin established Hussin Law.  As to the balance of such paragraph, Defendants deny Hussin decided to start her own firm.

31.     Admitted.

32.     Admitted to the extent Plaintiff agreed to continue paying Hussin for cases that settled prior to her separation from the firm. Denied as to the remaining balance of such paragraph.

33.     Admitted to the extent Hussin agreed to Plaintiff receiving 40% of the legal fees. Denied as to the remaining balance of such paragraph.

34.     To the extent it was part of Hussin's agreement with Lemberg, Denied.

35.     Admitted.

36.     Denied.

37.     Admitted.

38.     Denied.

39.     Denied.

40.     Denied.

41.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

42.     Denied to the extent Hussin failed to prosecute the Unfiled Cases. Denied to the extent Lemberg reassigned cases to counsel in states where defendants in those cases were domiciled or could be sued. As to the remaining portion of said paragraph, the Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

43.     Denied.

44.     Admitted to the extent Hussin transferred to herself via electronic mail various attachments and ZIP files. As to the remaining portion of said paragraph, Denied.

45.     Denied to the extent such information was confidential. The remaining portion of said paragraph is Admitted.

46.     Denied to the extent information transferred was proprietary or confidential. As to the balance of such paragraph, the Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

47.     Denied to the extent Defendants marketed to Plaintiff's clients. As to the balance of such paragraph, the Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

48.     Denied.

49.     Admitted to the extent Hussin directed settlement proceeds to be made to Hussin Law. As to the remaining portions of such paragraph, Denied.

50.     Defendants reincorporate and reallege the answers set forth in paragraphs 1-49 above as its answer to this paragraph 50.

51.     Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

52.     Denied.

53.     Denied.

54.     Defendants reincorporate and reallege the answers set forth in paragraphs 1-53 above as its answer to this paragraph 54.

55.     Denied.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Defendants reincorporate and reallege the answers set forth in paragraphs 1-58 above as its answer to this paragraph 59.

60.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

65.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

66.     Defendant reincorporates and realleges the answers set forth in paragraphs 1-65 above as its answer to this paragraph 66.

67.     Denied.

68.     Defendant reincorporates and realleges the answers set forth in paragraphs 1-67 above as its answer to this paragraph 68.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

73.     Defendant reincorporates and realleges the answers set forth in paragraphs 1-72 above as its answer to this paragraph 73.

74.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

75.     Denied.

76.     Denied.

77.     Defendant reincorporates and realleges the answers set forth in paragraphs 1-76 above as its answer to this paragraph 77.

78.     Denied.

79.     Denied.

80.     Defendant reincorporates and realleges the answers set forth in paragraphs 1-79 above as its answer to this paragraph 80.

81.     The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

82.     Denied.

83.     Denied.

84.     Defendant reincorporates and realleges the answers set forth in paragraphs 1-83 above as its answer to this paragraph 84.

85.     Denied.

86. The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

87. The Defendants lack sufficient knowledge or information upon which to form a belief and therefore leaves plaintiff to its proof.

88. Denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### (Material Breach of Contract)

1. Plaintiff's claims are barred, in whole or in part, by Lemberg's material breach of contract which occurred prior to the acts and events stated herein, and as such Defendants' obligation to perform under the agreement was excused.  Lemberg breached his agreement with Hussin, including but not limited to the following ways:

a. Lemberg unlawfully caused Hussin's signature to be affixed on settlement documentation without Hussin's knowledge or assent to do so.

b. Lemberg intentionally hid settlements from Hussin for cases in which Hussin's name was affixed on settlement documentation without her knowledge or assent to do so, then failed to pay Hussin the agreed upon fee.

c. Lemberg failed to pay Hussin the agreed upon percentage fee in settlements which were processed thru Lemberg' firm.

d. Lemberg deducted costs from client settlements which Lemberg had not incurred, causing Hussin's share of the legal fees to be decreased.

e. Lemberg deducted a $595 "PrivacyStar Cost" from client settlements which Lemberg had not incurred, causing injury to Californians who Hussin seeks to protect and reducing amounts to be paid to Hussin.

f.      Lemberg deducted "Administrative Costs" from client settlements which Lemberg had not incurred, and which costs were not discussed with or agreed upon by the clients, causing injury to Californians who Hussin seeks to protect and reducing amounts to be paid to Hussin.

g.      Lemberg ignored Hussin's repeated demands to reimburse clients whose settlements were reduced by costs not incurred.

h.      Lemberg ignored Hussin's repeated demands to provide Hussin with an accounting of cases in which Lemberg paid Hussin an insufficient fee or paid no fee whatsoever.

i.      By deducting costs from client settlements which had not incurred, Lemberg caused injury to Hussin's reputation as a result of affiliation with Lemberg's conduct.

j.      Lemberg referred a large number of new "clients" to Hussin who had been solicited by Lemberg's staff without identifying during the solicitation the true purpose of the call and/or the identity of the firm.

k.      Lemberg referred a large number of new "clients" to Hussin who were unaware of legal representation and who had not spoken with Lemberg's firm for purpose of pursuing legal action.

l.      Lemberg referred large number of new "clients" to Hussin without first discussing legal representation or a fee arrangement with them.

m.      Lemberg referred a large number of new "clients" to Hussin who had not signed a fee agreement as Lemberg was required to do under California and Connecticut laws.

n.      Lemberg knew Hussin had difficulty locating the new "clients" and repeatedly insisted Hussin file the cases without first speaking to the new "clients" to confirm the facts and/or to acknowledge their assent to pursue legal action.

o.      Lemberg instructed his paralegals to notate new files to indicate they had spoken with new clients prior to drafting complaints even if the new clients had not in fact been contacted. Based on Hussin's belief that her paralegal had confirmed the facts with the new

clients, Hussin unknowingly filed complaints on behalf of Californians who were unaware of legal representation.

p.      Lemberg failed to disclose the unlawful manner in which he solicited and retained a large number of new "clients" which he referred to Hussin despite repeated inquiries by Hussin as to propriety of Lemberg's practices.

q.      When Hussin challenged Lemberg's dubious methods of soliciting and retaining new "clients," Lemberg told Hussin to mind her own business and to take her California cases and go start her own firm.

r.      Lemberg refused to provide litigation support on cases transferred to Hussin's firm, and withdrew paralegal support from Hussin. Lemberg insisted on taking a 40% referral fee despite his firm having little to no involvement in the prosecution of the cases.

s.      Lemberg insisted on taking a 40% referral fee for new "clients' without even having discussed legal representation with them and without having obtained a signed fee agreement. Upon reaching the new "clients" when Hussin transferred the cases to her firm, most of them had no knowledge of Lemberg's firm and were unaware of legal representation, yet Lemberg insisted on taking a 40% referral fee on said cases.

t.      Lemberg refused to cooperate in a cost efficient manner in which Hussin could transfer her files to her new database. In refusing to cooperate in a cost efficient manner of transferring Hussin's files to her new database, Lemberg knew Hussin was forced to resort to manually transferring her files by emailing thousands of PDF and ZIP files to herself and her new paralegal. Lemberg somewhat cooperated by sending some of Hussin's documents to her via DropBox. All of the documents sent by Hussin and Lemberg came in unnamed PDF formats, and Hussin was forced to open each document, read its contents, and rename the file. Based on Lemberg's unreasonable refusal to efficiently transfer Hussin's case files, Hussin was also forced to manually rebuild her client database, by manually inputting the names and contact information and case details for each case transferred to Hussin's firm. Lemberg knew his refusal to

cooperate resulted in Hussin wasting hundreds of hours and thousands of dollars in manually transferring and renaming documents, and in rebuilding files on Hussin's new database.

u.      Lemberg took cases back which he had referred to Hussin without advising or discussing the same with Hussin. Lemberg took cases which he knew Hussin had already transferred to her new database, knew she had already communicated with the clients, and/or knew she had communicated with opposing counsel. Lemberg "cherry picked" thru Hussin's cases, and took only those which Hussin had made more valuable as a result of her efforts. Unaware of Lemberg's takings, Hussin continued to spend time prosecuting the cases and preparing them for litigation without knowing the cases were no longer hers. In some instances, Hussin contacted the defendant in an effort to resolve the matter on a pre-litigation basis only to be told by opposing counsel Lemberg's firm had already submitted the claim. Lemberg caused Hussin to unnecessarily duplicate Lemberg's efforts, and then Lemberg never paid Hussin a fee for cases which he took from her and settled.

v.      After Hussin advised Lemberg she discovered his wrongdoings, Lemberg threatened to injure and cause financial ruin to Hussin. Lemberg's threats included, but were not limited to, the following statements in emails: "I'm going to squeeze you like a cockroach," "I'm going to ruin you," "bankrupt you," "I'm going to take you for every penny you're worth," and likened Hussin to a "dead cat." Lemberg's threats caused Hussin to fear for her personal safety, and caused Hussin great worry and distress.

w.      Lemberg intimidated, threatened and ultimately coerced Hussin into withdrawing from a California class action which she had initiated and litigated, and which the client did not wish for Hussin to withdraw. Lemberg then breached his agreement by refusing to acknowledge his written agreement that Hussin would still be entitled to 20% of the attorneys fees in said class action if she agreed to withdraw from the case.

x.      Lemberg solicited and retained Californians using Hussin's name as his California attorney, but did not refer the cases to Hussin. Instead, Lemberg engaged in the unauthorized

practice of law by taking Californians to other states and using contrived jurisdictional bases to pursue legal action on their behalf.

y.      Lemberg failed to adhere to his professional responsibilities with respect to persons who contacted Lemberg's firm to speak to Hussin after she was no longer with Lemberg's firm. As is required under California and Connecticut law, Lemberg failed to instruct his staff to advise callers asking to speak with Hussin that she is no longer with the firm and failed to provide them with Hussin's new contact information. Californians who requested to speak to Hussin were not advised of her departure and not provided with Hussin's new contact information. Lemberg breached his agreement with Hussin by not disclosing names of return clients who wished to be represented by Hussin, and caused Hussin to miss out on potential financial gain.

z.      One Californian who had called to request to speak to Hussin was not advised that Hussin was no longer with the firm. Instead, unbeknownst to the Californian, Lemberg filed suit on his behalf in Nebraska without ever having spoken to the client and without knowing facts sufficient to support the complaint Lemberg filed. He emailed Lemberg, and said: "Do not represent me because I never hired Lemberg Law as my attorney and never authorized your law firm to file a complaint on my behalf." Thereafter, Lemberg dismissed the complaint after repeated demands by Hussin.

aa.      Lemberg told Hussin verbally and in emails he was no longer retaining or soliciting Californians and was likely no longer going to maintain a presence in California. Notwithstanding such representation, Lemberg continued to solicit and retain Californians while advertising Hussin's name as his California attorney. Lemberg took these Californians and filed suit on their behalf in other states using false jurisdictional bases, and sometime using the address of a law firm who represented the defendant as a guise to support jurisdiction. In addition, Lemberg failed to plead California state laws in said complaints which could have entitled them to additional recovery.

2.      Based on the foregoing, Lemberg was in material breach of his agreement with Hussin, and therefore Hussin was excused in performing her obligations under the terms of her agreement with Lemberg.

3.      Based on Lemberg's material breach and in order to protect her interests and the interests of the Californians who Hussin sought to protect, Hussin was justified in advising Lemberg that all future settlements would be processed thru Hussin Law.

4.       Based on Lemberg's material breach and in order to protect her interests and the interests of Californians who Hussin sought to protect, Hussin was and is justified in processing Lemberg case settlements thru Hussin Law, rather than to allow Lemberg to continue processing settlements and unlawfully taking from clients and Hussin.

5.      Based on Lemberg's material breach, Hussin was justified in advising Lemberg she would hold funds due to Lemberg in a separate account until such time as Lemberg reimbursed each and every Californians who was charged unlawful PrivacyStar charges and Administrative Fees.

6.      Based on Lemberg's material breach, Hussin is justified in continuing to withhold funds due to Lemberg until such time as Lemberg reimburses each and every Californian who was charged unlawful PrivacyStar charges and Administrative Fees and their settlement proceeds are recalculated.

7.      Based on Lemberg's material breach, Hussin is justified in continuing to withhold funds due to Lemberg until such time as Lemberg pays Hussin for each California settled case in which Hussin was not paid the proper fee or was paid no fee at all.

8.      Based on Lemberg referring new "clients" to Hussin who were unaware of legal representation and many new "clients" were unresponsive to Hussin's attempts to reach them,

Hussin was justified in not filing Unfiled Cases until such time as the new clients could be reached.

9.     Based on Lemberg stealing and hiding cases he referred to Hussin, Hussin was justified in abandoning the rest of Lemberg's Unfiled Cases. Hussin wasted time and effort in prosecuting unfiled cases only to find Lemberg had taken the cases, and was unaware whether or when Lemberg would take other cases from her.

10.     Based on Lemberg's material breach, Hussin is justified in continuing to withholding funds due to Lemberg until such time as it determined the amount of monies Lemberg owes to Hussin and Californians.

11.     Based on Lemberg's material breach and Lemberg's lack of involvement in the cases referred to Hussin, Hussin should not be obligated to pay Lemberg the usurious and unethical 40% referral fee.

12.     Based on Lemberg's material breach and referring new "clients" to Hussin who were unaware they had spoken to a law firm for the purpose of pursuing legal action, who were unaware of legal representation, and who not signed a fee agreement, Hussin should not be obligated to pay Lemberg any fee whatsoever.

## SECOND AFFIRMATIVE DEFENSE

### (Doctrine of Unclean Hands)

1.     Lemberg's claims against Hussin are retaliatory in nature and this action was prompted by Hussin's recent assertion of her 20% entitlement to the Horton Class Action.

2.      Lemberg knew his refusal to allow Hussin to transfer her files in a cost efficient manner was unreasonable and unfair. Lemberg knew Hussin was forced to manually transfer thousands of documents, knew that each document came to Hussin in an unnamed pdf file, and knew that by his refusal Hussin was wasting hundreds of hours rebuilding her case files.

3.      Lemberg knew Hussin was forwarding her files on Lemberg's database via email and in fact, Lemberg himself sent volumes of documents to Hussin via DropBox. Lemberg knows his allegations of computer theft are untrue. Lemberg knows Hussin did not steal proprietary information and knows that nothing between he and Hussin ever was proprietary or confidential. Hussin and Lemberg exchanged and used each other's resources freely before and after she started her own firm. Hussin had unfettered access to the Firm's national database and Lemberg had access to all of Hussin's pleadings and discovery templates.

4.      Lemberg conduct was unethical, unfair, and unlawful.

5.      Lemberg charged unauthorized costs to Californians, and was angered by Hussin's objections to the same.

6.      Lemberg knew he referred clients to Hussin who had not executed a fee agreement and who were unaware of legal representation, and was angered by Hussin's objections to the manner in which he solicited and retained PrivacyStar Clients.

7.      Lemberg wrongfully charged a $595 to PrivacyStar cost to clients even though he in fact only paid PrivacyStar $45 per referral.

8.      Lemberg intentionally failed to pay Hussin in accordance with their agreement. Lemberg intentionally hid cases from Hussin and intentionally failed to pay Hussin. Lemberg intentionally caused Hussin's name to be affixed to settlement documentation without her

knowledge and consent, and then hid the settlement from Hussin in order to avoid paying her the agreed upon fee.

9.     Lemberg knew that by adding costs to client settlements which did not exist, it would serve to reduce the amount paid to Hussin.

10.     Lemberg knows his allegations of breach of contract against Hussin are untrue. Lemberg knew Hussin was processing settlements thru her firm and knows Hussin was depositing Lemberg's fees and his costs in a separate bank account entitled "Lemberg Escrow." Lemberg knows Hussin periodically emailed him with updates on settled cases, and knows that she periodically provided an XLS sheet with a breakdown of the settlements.

11.     Lemberg knows that each time Hussin provided him with an update on Lemberg settlements, the XLS sheet showed what amounts Hussin had deposited in the Lemberg Escrow bank account. Lemberg knows Hussin always stood willing to pay Lemberg as soon as Lemberg reimbursed the clients and provided Hussin with an accounting of what he owes Hussin. Lemberg knows Hussin made many attempts to come to terms with Lemberg, and knows he ignored many of her repeated efforts to resolve their differences.

12.     Lemberg has unlimited resources to bankrupt and ruin Hussin as he promised to do in writing, and Lemberg knows Hussin's financial resources are limited. Lemberg knows that by filing this suit against Hussin and aggressively litigating the same, no matter how frivolous and untrue, this litigation will cause Hussin great financial injury. Lemberg's intention to "ruin" and "bankrupt" Hussin will be realized by this litigation, even though he will not prevail in the claims against her.

13.     Lemberg is the subject of a Grievance Panel investigation in Connecticut as a result of his misconduct.

14.     Based upon the foregoing and the allegations of the Counterclaim below, Lemberg lied, cheated, stole, forged, engaged in the unauthorized practice of law, broke a veritable plethora of Connecticut and California ethical rules, and has commenced this action for the improper purposes set forth below.

15.     As a result of all the foregoing, Lemberg comes to this Court with unclean hands, and therefore some or all of its claims should be barred.

## COUNTERCLAIM

## FACTUAL BACKGROUND APPLICABLE TO ALL COUNTS

1.     Sergei Lemberg ("Lemberg") is the sole owner of Plaintiff, Lemberg Law, LLC (the "Firm"). During all times mentioned herein, Lemberg acted on his own behalf and on behalf of the Firm. As such, Lemberg and the Firm will be treated as one in the same, and shall hereafter be collectively referred to as "Lemberg".

2.     In or around March of 2011, Hussin and Lemberg entered into a business relationship.

3.     When the business relationship began, it was agreed that Hussin would act as California counsel for the Firm. Lemberg agreed to provide litigation and paralegal support to Hussin, and Hussin agreed to prosecute and litigate the cases referred to her by Lemberg.

4.     The relationship between Hussin and Lemberg quickly developed into more of a partner-type relationship. Lemberg and Hussin regularly discussed day to day operations of the Firm, and Lemberg regularly relied on Hussin to make decisions and policy changes within the Firm.

5.      Hussin revised, corrected and standardized Lemberg's pleadings on a nationwide basis, and worked with the Firm's paralegals and support staff to increase the quality of their work product.

6.      Hussin interviewed, hired, and trained Lemberg's of-counsel attorneys in other states.

7.      Hussin provided ongoing support and assistance to new and existing of-counsel attorneys, assisting them with settlement and litigation strategies, and assisted Lemberg in monitoring and evaluating the performance of his of-counsel attorneys.

8.      When the relationship between Hussin and Lemberg began, the Firm's practice consisted primarily of cases involving violations of the Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et. seq.*("FDCPA").

9.      Sometime in or around the middle of 2012, Hussin became interested in the Telephone Consumer Protection Act, 47 U.S.C. §227, *et. seq.* ("TCPA"). The TCPA prohibits the use of automated calls without the prior express consent of the person called. Violators of the TCPA are subject to statutory damages ranging from $500 to $1,500 per call.

10.     On her own volition and not at the request of Lemberg, Hussin conducted extensive research on the TCPA, developed TCPA flow charts, and created TCPA pleading templates to incorporate into her pleadings.

11.     Hussin convinced Lemberg to incorporate TCPA claims into the Firm's cases on a nationwide basis.

12.     Hussin trained and educated the Firm's paralegals, staff attorneys and of-counsel attorneys on the TCPA, and conducted a TCPA training presentation at Lemberg's Connecticut office in December of 2012 for the Firm's staff and of-counsel attorneys.

13.     Hussin shared her TCPA flow charts with the Firm, helped revise the Firm's intake procedures for TCPA cases, and instituted new protocols for the effective litigation of Lemberg's TCPA cases.

14.     Hussin provided ongoing support to Lemberg, his paralegals, in-house counsel, and of-counsel attorneys with respect to TCPA claims and issues.

15.     Hussin continued to revise and refine her own TCPA pleadings, and freely shared the same with Lemberg, his staff, and Lemberg's of-counsel attorneys.

16.     In or around January of 2013, Hussin convinced Lemberg to initiate TCPA class actions on a nationwide basis, and assisted the Firm's staff in identifying potential TCPA class actions.

17.     Hussin became responsible for identifying potential class actions for new clients of the Firm. Hussin interviewed and screened the Firm's new clients with potential TCPA class claims and assisted in engaging the Firm's clients to act as class representatives.

18.     Hussin and Lemberg agreed that Hussin would receive twenty (20) percent of whatever attorneys fees were recovered in TCPA class actions filed by Hussin in California.

19.     Hussin filed and litigated a number of TCPA class actions in California. One such matter was *Horton v Cavalry Portfolio Services, LLC*, which was filed on February 7, 2013 (Case no. 3:13-cv-00307, USDC Southern Dist. Cal.) (hereinafter the "Horton Class Action").

20.     During all times mentioned herein, Hussin and Lemberg exchanged and used each other's resources freely. Hussin had unfettered access to the Firm's national database and Lemberg had access to all of Hussin's pleadings and discovery templates.

21.     Hussin and Lemberg frequently exchanged pleadings and discovery templates, and Hussin shared all of her independent work product with the Firm's paralegals, in house counsel, and of-counsel attorneys.

22.     In addition to Firm related business, with the knowledge and consent of Lemberg, Hussin used the Firm's remote system for her own legal and personal business. Hussin used the Firm's remote system to store and maintain her own files, including her research, her pleadings, her templates, her client files, and her personal files.

23.     Hussin also used the Firm's remote system to store and maintain files for her own clients.

24.     Hussin frequently brought her own clients to the Firm.

25.     The financial arrangement between Lemberg and Hussin changed from time, and Hussin's percentage fee for settled California cases increased as her input and value to the Firm increased.

26.     In addition to a percentage fee for settled cases, for a period of time Lemberg paid Hussin on an hourly basis for assisting Lemberg in the day to day operations of the Firm.

27.     Though Hussin's percentage increased on settled cases, the agreement between Hussin and Lemberg as it relates to Hussin's share in the California TCPA class actions remained the same. At all times referenced herein, Lemberg agreed Hussin would receive twenty (20) percent of the attorneys fees obtained for California class actions filed by Hussin.

28.     With relevance to the TCPA cases and unwanted calls, PrivacyStar is a telephone application which provides a service to identify who is calling and why. The PrivacyStar application enables users to file complaints about unwanted phone calls with the Federal Trade Commission (the "FTC").

29.     One such application powered by PrivacyStar is MetroBlockIt. MetroBlockIt is an app for customers of a telephone carrier, MetroPCS.

30.     When a customer uses PrivacyStar or MetroBlockIt to block a caller, the app then asks the customer if they wish to file a complaint against the caller with the Fair Trade Commission ("FTC").

31.     Jefferson Stalnaker ("Stalnaker") is the founder and CEO of PrivacyStar.

32.     Unbeknownst to Hussin, in or around October of 2013, Stalnaker entered into an agreement with Lemberg whereby PrivacyStar provided Lemberg with the names and telephone numbers of users who filed a complaint with the FTC (hereinafter referred to as "PrivacyStar Clients"). Lemberg paid a referral fee to Stalnaker of no more than $45 for each individual referral.

33.     PrivacyStar processes thousands of FTC complaints on a monthly basis, which resulted in a high volume of referrals to Lemberg's firm.

34.     Upon obtaining the contact information from PrivacyStar, Lemberg's intake staff then called the PrivacyStar Clients to request information about the unwanted caller.

35.     Lemberg's intake personnel are not lawyers or paralegals.

36.     The Firm's intake staff requested details about the unwanted caller and proof of the calls. PrivacyStar Clients provided details of the unwanted calls to Lemberg's intake staff.

37.     Most of Hussin's PrivacyStar Clients had no idea they were speaking to a law firm when they provided details of the unwanted caller to the Firm.

38.     Most of Hussin's PrivacyStar Clients provided details to the Firm believing it was in furtherance of their FTC complaint, and they were unaware the purpose of the Firm's call was related to legal services.

39.     Lemberg's intake staff did not advise most of Hussin's PrivacyStar Clients the call was related to the provision of legal services.

40.     Some of Hussin's PrivacyStar Clients thought they were speaking to the FTC or a government entity when they provided details of the unwanted calls to the Firm.

41.     Some of Hussin's PrivacyStar Clients knew they were speaking to a law firm, but believed the Firm was somehow affiliated with the FTC, and they did not understand the call was related to the provision of legal services.

42.     Some of Hussin's PrivacyStar Clients PrivacyStar Clients were told by Lemberg's staff they were entitled to money for the unwanted calls. However, they believed the money would be obtained thru a government program, and did not understand the Firm intended to pursue legal action on their behalf.

43.     Upon information and belief, often times during the call, Lemberg's intake staff sent a link to Hussin's PrivacyStar Clients, and directed them to click on the link in order to provide proof of the unwanted calls.

44.     Upon information and belief, by following the link provided by the Firm, a Request for Legal Services is automatically sent to the Firm.

45.     By clicking on the link to provide proof of the unwanted calls to the Firm, PrivacyStar Clients unknowingly sent the Firm a Request for Legal Services.

46.     Most of Hussin's PrivacyStar Clients did not understand by clicking on the link, they had also sent a Request for Legal Services to the Firm.

47.     Most of Hussin's PrivacyStar Clients who clicked on the link did not understand it was for the purpose of pursuing a legal claim.

48.     Most of Hussin's PrivacyStar Clients did not see or notice a Request for Legal Services, and did not intend to request legal services by clicking on the link to send proof of the unwanted calls.

49.     Lemberg's intake staff did not discuss legal services during the call with most of Hussin's PrivacyStar Clients.

50.     The Firm did not discuss fee division or costs to be charged against any recovery, and did not obtain a signed fee agreement from any of Hussin's PrivacyStar Clients.

51.     None of the foregoing was known to Hussin at the time, and beginning in or around October of 2013, Hussin started getting flooded by Lemberg with new TCPA cases.

52.     After speaking to Lemberg's intake staff and obtaining additional information about the calls, Lemberg opened a new file for the PrivacyStar Clients.

53.     Once a new file is opened, the Firm's case management system, ProLaw, alerts the responsible paralegal of the new matter.

54.     ProLaw assigns the responsible paralegal a task to contact the new client and confirm the facts and then draft a complaint for the attorney.

55.     Once the responsible paralegal confirms the facts with the new client and drafts a complaint, the paralegal marks the event as done in ProLaw. ProLaw then assigns a task to the responsible attorney to review the draft complaint and approve it filing or for pre-litigation.

56.     When Hussin received an alert from Prolaw that a complaint had been drafted and ready for review for PrivacyStar Clients, ProLaw showed that Hussin's paralegal, Olga Voytovych ("Olga"), had contacted the client to confirm the facts.

57.     Unbeknownst to Hussin, Lemberg instructed his paralegals to prepare a draft complaint for new PrivacyStar Clients even if the paralegal could not reach the client to confirm the facts. .

58.     Unbeknownst to Hussin, Lemberg instructed his paralegals to check off the event in Prolaw to indicate PrivacyStar Clients had been contacted and the facts had been confirmed even if the paralegal had never communicated with them.

59.     In or around November of 2013, Hussin began to notice most of her new TCPA cases were MetroPCS customers.

60.     On several occasions, Hussin discussed her amazement in the high number of MetroPCS clients with Lemberg, and even told Lemberg she had purchased stock in MetroPCS believing it to be the telecommunications carrier of the future. During these conversations, although Lemberg and Hussin frequently discussed intricate details of the Firm's operations, Lemberg never mentioned anything about Stalnaker or his arrangement with PrivacyStar.

61.     Hussin had a policy that either she or Olga speaks to new TCPA clients prior to reviewing, revising, and filing a complaint. It was and is Hussin's belief that TCPA cases require more preparation and gathering of evidence than FDCPA cases, and that TCPA cases must be well documented with proof prior to filing a complaint.

62.     Hussin encouraged the of-counsel attorneys whom she oversaw to likewise not be hasty in filing TCPA claims.

63.     Inasmuch as Prolaw indicated that the paralegal had contacted the new PrivacyStar Clients to confirm the facts, even if Hussin was unable to reach the client, she revised the draft complaint based on the evidence in the file, and approved the new matter for filing.

64.     After Hussin's new TCPA cases were filed, many of her new TCPA clients remained unresponsive and hard to find.

65.     Hussin began to notice the unresponsive clients were those who used MetroPCS as their carrier, but still had no knowledge of Lemberg's arrangement with PrivacyStar.

66.     The PrivacyStar Clients' cases were typically worth a substantial sum of money. When Hussin called to introduce herself to the PrivacyStar Clients and to advise them of the potentially sizable value of their case, many seemed surprised they had retained the Firm and suspect of Hussin's true intentions.

67.     Hussin grew concerned over the reactions from her new clients, and began to question Lemberg on his methods for obtaining new TCPA clients, and questioned why the MetroPCS customers were those who were unresponsive.

68.     Lemberg grew increasingly frustrated with Hussin's inquiries, and began telling Hussin that his business practices were none of her business.

69.     In or around October of 2013, the Firm opened a new California PrivacyStar Client file for Mr. John "Doe" (hereinafter referred to as "John"). John's case was worth a substantial sum of money, and ultimately settled for the sum of $200,000.00.

70.     After John's matter was opened, Prolaw alerted Hussin that John's complaint had been drafted and it was ready for review and filing.

71.     ProLaw indicated Olga had contacted John and confirmed the facts prior to drafting John's complaint for Hussin's review.

72.     Like many of Hussin's new TCPA clients, John was unresponsive to Hussin's efforts to communicate with him.

73.     Hussin finally reached John sometime in or around mid-November of 2013. Hussin introduced herself as his California attorney and advised John of the potential value of his TCPA case.

74.     John had no knowledge of a law suit, and told Hussin he had never discussed legal representation with a law firm. John had never heard of Lemberg Law, and had no knowledge whatsoever of the Firm.

75.     After speaking to John, Hussin contacted Lemberg to discuss the contents of the conversation. Hussin again questioned Lemberg's methods of obtaining new clients, and voiced her concern with Lemberg on what she perceived to be questionable solicitation practices.

76.     Lemberg resented Hussin's inquiries and refused to discuss anything related to MetroPCS or his solicitation practices. Lemberg told Hussin if she didn't like the way he ran his business, she should start her own firm.

77.     ProLaw had indicated that Hussin's paralegal had spoken with John to confirm the facts; however, John insisted he had not spoken with a paralegal.

78.     Hussin asked her paralegal, Olga ("Olga") whether she had in fact communicated with John prior to drafting a complaint and checking off the event in ProLaw.

79.     Olga advised Hussin that she had not in fact communicated with John, but had checked the event off in ProLaw based on Lemberg's instruction. Olga told Hussin that Lemberg had instructed the Firm's paralegals to check off the "contacted client" event even if they had not spoken to the new clients.

80.     In preparation for this litigation, Hussin reviewed John's telephone records and the records of other PrivacyStar Clients to determine whether they communicated with the Firm on the day ProLaw showed they had been contacted to confirm the facts. Upon review, Hussin

discovered a number of instances wherein ProLaw indicated a paralegal had contacted the client and confirmed the facts, but the client's phone records did not reflect a call to or from the Firm on or near the date reflected in ProLaw.

81.     .

82.     Hussin challenged Lemberg on his directive to the paralegals, and complained that it misled the responsible attorney into believing the new clients had in fact been contacted by the responsible paralegal.

83.     The relationship between Lemberg and Hussin grew increasingly strained, and Lemberg and Hussin no longer discussed day to day operations of the Firm.. Lemberg continued to encourage Hussin to start her own firm if she didn't like the way he conducted business.

84.     Lemberg had a strict policy of getting draft complaints filed promptly. Even if the responsible attorney could not reach the new client, Lemberg's policy and/or practice was to file the complaint irrespective of whether the client had been reached.

85.     Hussin was opposed to Lemberg's expedited case filing policy as it related to new TCPA cases, especially inasmuch as Hussin was unable to locate many of her new "clients." Additionally, Hussin believed that TCPA cases were more complicated and required more client involvement than FDCPA cases, and felt it was necessary to communicate with the client, and obtain and preserve evidence to support TCPA allegations prior to filing a complaint.

86.     More importantly, Hussin had her own policy of not filing new TCPA cases until such time as either she or her paralegal communicated with the new client to confirm the facts, and to gather evidence needed for new TCPA claims.

87.     Hussin also encouraged the Firm's staff and the of-counsel attorneys whom she managed to communicate with new TCPA clients and obtain information and proof prior to filing a complaint with TCPA allegations.

88.     After discovering some of the new TCPA clients had not in fact spoken to a paralegal and/or had confirmed the facts, Hussin determined she would not file complaints until such time as she or Olga had reached the new clients, confirmed the facts, and gathered sufficient evidence for the case.

89.     Hussin grew increasingly suspect of Lemberg's business practices, and continued to challenge his conduct. By the end of 2013, discussions on unraveling their relationship and Hussin starting her own firm became more serious.

90.

91.     Inasmuch as John's case was worth a substantial sum of money, John agreed to sign a fee agreement and proceed with the case.

92.     Although John had agreed to representation, he remained suspect and distrustful of Hussin, and repeatedly questioned her intentions. John requested to meet Hussin in person, and on January 23, 2014, Hussin and John met for lunch.

93.     During their meeting, John inquired more about how the Firm obtained his contact information. John was convinced the Firm had obtained his contact information in a nefarious way, and insisted he had never spoken with anyone other than the FTC.

94.     John asked Hussin why he was not informed that he was speaking to a law firm or that legal action was going to be pursued on his behalf. Hussin, unaware at the time of how the Firm obtained John's information or the manner in which he was "retained", was unable to provide John with explanations.

95.     John then told Hussin he had been contacted by the FTC shortly after he filed the FTC complaint using MetroBlockIt. He told Hussin the caller asked for more information regarding his FTC complaint, and that he thought he was speaking to the FTC when he provided additional information.

96.     It was then Hussin finally pieced together Lemberg's PrivacyStar scam. It was not the FTC who had called John about the complaint, it was the Firm.

97.     Hussin asked John to provide her with details of the FTC complaint process, and asked him to provide her with screenshots of his complaint. On January 29, 2014, John provided Hussin with screenshots of his FTC complaint and the complaint process using MetroBlockIt.

98.     Hussin grew more concerned than ever over Lemberg's practices. The next day on January 30, 2014, Hussin sent a text to Lemberg and said "I have a concern about PrivacyStar."

99.     On or around, January 31, 2014, Hussin confronted Lemberg with what she had discovered about PrivacyStar. Hussin told Lemberg that she had concluded the manner of obtaining PrivacyStar Clients was unethical and must be stopped.

100.     Lemberg was outraged Hussin had figured out how PrivacyStar Clients were "retained." Lemberg told Hussin he could no longer tolerate her repeated inquiries into the propriety of his conduct, and told Hussin to take her California cases and go start her own firm.

101.     Lemberg and Hussin agreed that Hussin would transfer the California cases to her new firm, and that Hussin would receive 60% of the attorney's fees of all California cases that were presently in the database.

102.    Lemberg and Hussin also agreed that Hussin would receive 60% of cases which she had previously approved for pre-litigation ("Pre-litigation Cases"), even if one of Lemberg's staff attorneys handled the settlement.

103.    Lemberg and Hussin also agreed that Hussin's 20% share in the class actions would remain the same, and that Hussin and Lemberg would continue to litigate the California class actions together.

104.    In early February of 2014, Hussin began preparing to run her own legal practice.

105.    Though she and Lemberg had parted ways, the relationship between them remained somewhat amicable.

106.    As Hussin had never run her own business before, Lemberg counseled Hussin on various law firm start-up issues, including document management systems to consider, whether to incorporate, and support staff.

107.    By the end of February of 2014, Hussin had hired a paralegal, incorporated, and obtained her own remote system, document management, and her own email address.

108.    In early March of 2014, Hussin advised Lemberg she was ready to transfer her files to her own remote system and requested that Lemberg allow her paralegal, Teacha Adams, to initiate the data transfer. Hussin advised Lemberg that Adams had recently done a data transfer for another law firm and was experienced and qualified to affect the transfer.

109.    Lemberg said he wished to communicate directly with Adams to ensure she was qualified to transfer the files and experienced in data transfer.

110.    Adams and Lemberg engaged in communications about transferring Hussin's data.

111.    Although Adams had experience in law firm data transfers, Lemberg concluded Adams lacked the know how to properly transfer Hussin's files.

112.    Lemberg advised Hussin he would only allow an experienced IT person to transfer her files.

113.    Hussin then presented Lemberg with an IT professional employed by Hussin's remote case management system. He was specially trained and experienced in transferring legal files from other remote systems to their own system.

114.    Hussin requested that Lemberg allow Hussin's data transfer expert to work with Lemberg's IT staff.

115.    After repeated requests, Lemberg ultimately advised Hussin he would not allow the IT professional to access her files to affect the transfer.

116.    Inasmuch as Lemberg would not permit a data transfer, Hussin began emailing her documents to her new email address and to Adams' email address.

117.    Hussin assigned Adams with the task of rebuilding the files on her new database once received via email.

118.    Transferring the documents by email quickly became an administrative nightmare for Hussin and Adams. Hussin had thousands of documents stored on Lemberg's database. Each document came to Hussin's firm in an unnamed pdf format.

119.    Hussin and Adams were  required to open each document, figure out what it was, and then rename it and save it to the appropriate file.

120.    Likewise, since Lemberg would not allow access to the IT professional, the contact information and case information for each client had to be manually rebuilt.

121.    Meanwhile, Hussin had a massive caseload of approximately 60 cases in active litigation, most of which were PrivacyStar cases. Adams was overwhelmed with rebuilding Hussin's files, and Lemberg had withdrawn all paralegal and litigation support from Hussin. Many of the filed cases were PrivacyStar Clients, and Hussin was still unable to find some of them..

122.    Hussin pleaded with Lemberg to allow the IT professional to transfer the rest of her files. Hussin explained to Lemberg that transferring the documents via email resulted in the documents coming over in unnamed pdf files, and that it was unduly burdensome to manually transfer her files and client contact information manually.

123.    .

124.    Despite repeated requests, Lemberg continued to refuse to allow the IT professional affect the transfer, and unreasonably prevented Hussin to utilize an efficient and cost effective manner by which Hussin could transfer her files.

125.    Hussin continued emailing her documents and files in order to rebuild the cases files onto her own database.

126.    Lemberg also sent Hussin some of her documents via DropBox, but those too came in unnamed pfd files.

127.    With Lemberg's knowledge and consent, Hussin continued to use Lemberg's remote system freely and continued to sometimes use her Lemberg email for communications.

128.    As Adams was working over-time rebuilding Hussin's case files, Lemberg allowed Hussin to use Olga for some case filings, but would not allow Olga to assist on anything else.

129.    Olga provided Hussin with assistance in getting Hussin's paralegal organized. Olga sent Hussin a list of nationwide process servers, helped Hussin and her paralegal take over ECF filings, and answered Hussin's many questions regarding filing and service issues.

130.    Although Hussin had started her own firm, she continued to assist some of Lemberg's of-counsel attorneys who she previously had overseen, on TCPA issues and settlement strategies.

131.    Inasmuch as Lemberg had not obtained signed fee agreements for the matters referred to Hussin, Hussin secured signed fee agreements from the Lemberg clients, she was able to find.

132.    As Hussin no longer wished to be affiliated with the Firm, Hussin  filed a Notice of Change in her Filed Cases referred by Lemberg, and thereafter prosecuted the cases under her firm's name.

133.    By the end of March of 2014, most of Hussin's cases had been rebuilt on her new system and Hussin used her own case management system for cases referred to her by Lemberg.

134.    Inasmuch as manually transferring the data for large case files was so burdensome, Hussin did not transfer the documents from the larger files. With Lemberg's knowledge and consent, Hussin continued to use Lemberg's remote system to access information from the files.

135.    Likewise, manually transferring contact information and case details had proved time consuming. As such, Hussin did not transfer contact information and case details and with Lemberg's knowledge and consent, continued to use Lemberg's system when she needed to access information.

136.    With Lemberg's knowledge and consent, Hussin continued to utilize Lemberg's remote system when she needed to access anything, and Hussin's unfettered access to Lemberg's database remained identical to what it had been prior to her departure.

137.    Prior to Hussin starting her own firm, settlements were processed thru Lemberg's firm. Hussin never had a say in, and never had access to, the process by which Lemberg determined how to distribute settlement proceeds.

138.    Hussin trusted Lemberg had been properly paying the clients and Hussin for settlements, and therefore Lemberg's firm continued to process settlements for Hussin's Lemberg cases even after she started her own firm.

139.    In or around March of 2014, Hussin settled a Filed Case for Brittany Dixon. Dixon was a PrivacyStar Client who had no knowledge she had retained a law firm.

140.    On March 29, 2014, Dixon received a settlement statement and settlement payment from Lemberg.

141.    Dixon contacted Hussin to object to the high cost which was deducted from her settlement. Hussin advised Dixon she had no knowledge of the actual costs, and provided Dixon with Lemberg's contact information.

142.    Lemberg spoke to Dixon and advised her the cost deductions from her settlement were correct.

143.    Unbeknownst to Hussin at the time, Lemberg had deducted a $595 PrivacyStar cost from Dixon's settlement.

144.    The PrivacyStar cost deducted from Dixon's settlement caused Dixon's settlement proceeds to be reduced.

145. The PrivacyStar cost deducted from Dixon's settlement caused Hussin's share of the attorney's fees to be reduced.

146. Upon information and belief garnered from Stalnaker, PrivacyStar never charged $595 for an individual referral, and Lemberg never paid $595 for an individual referral. In fact, although Lemberg charged Dixon, and an untold number of others, a $595 PrivacyStar cost, Stalnaker never charged Lemberg more than $45 for any individual PrivacyStar referral.

147. Not knowing at the time about PrivacyStar, Hussin questioned Lemberg about the high cost deducted from Dixon's settlement. Lemberg insisted the cost was accurate.

148. Hussin began to distrust Lemberg's manner of distributing proceeds from cases Hussin settled.

149. In or around the middle of May, 2014, Hussin discovered one of her Pre-litigation cases for client, Sara "Doe" ("Sara") had settled, but Lemberg had not paid Hussin the agreed upon a fee.

150. Hussin went to search for Sara's case file on Lemberg's database and noticed Lemberg had, without prior notice or Hussin's consent, blocked Hussin's access to only California cases on Lemberg's database.

151. Lemberg had moved Sara's case file from California to Massachusetts in his database. Having blocked Hussin's access to view cases in other states, Hussin was no longer able to see or access Sara's file.

152. Hussin discovered that her signature had been affixed to Sara's settlement agreement without Hussin's knowledge or consent.

153. Hussin had neither seen, nor approved of Sara's settlement agreement, and had no knowledge her signature had been forged on the settlement agreement.

154.    Lemberg did not tell Hussin Sara's case had settled.

155.    Upon information and belief, Lemberg caused Hussin's name to be forged on Sara's settlement agreement, intentionally moved Sara's file to Massachusetts, and blocked Hussin's access to view other states, and intentionally failed to pay Hussin in accordance with their agreement.

156.    Lemberg's conduct prompted Hussin to investigate the propriety of other settlements which had been processed thru Lemberg's firm, and discovered a plethora of other wrongdoings.

157.    Hussin noticed some of her other Pre-litigation Cases had disappeared from her case list in Lemberg's database. Some of the Pre-litigation Cases that disappeared were matters which Hussin had communicated with the clients and in some instances had engaged in communications with the defendant or opposing counsel.

158.    Inasmuch as Hussin was working mostly from her own remote system, Hussin was unaware Lemberg's had taken back cases and continued to prepare unfiled cases for legal action.

159.    Lemberg took Pre-Litigation Cases from Hussin which Prolaw showed that Hussin had worked the case, had communicated with the client and/or opposing counsel.

160.    The taking of the Pre-Litigation resulted in Hussin wasting time and losing money on the fees to which Hussin should be entitled.

161.    Lemberg had not discussed taking back cases he had referred to Hussin and Hussin did not consent to Lemberg taking back cases.

162.    Lemberg "cherry picked" Hussin's cases, and took those which Hussin had made valuable as a result of her efforts.

163. Lemberg did not take cases from Hussin which had little value or cases in which the "client" could not be found.

164. Lemberg did not pay Hussin a fee for the cases which he took back from her.

165. In addition to charging Dixon, Lemberg also charged other PrivacyStar Clients a $595 PrivacyStar cost.

166. Lemberg also deducted "Administrative Costs" from client settlements in Pre-litigation Cases, even though Lemberg incurred no costs on cases which Hussin resolved on a pre-litigation basis.

167. The Administrative Costs assessed to the settlements in Hussin's Pre-litigation Cases were not in fact incurred by Lemberg and were not discussed with Hussin.

168. The Administrative Costs assessed to the settlements in Hussin's Pre-litigation cases were not discussed with the clients, nor did clients agree to pay Lemberg Administrative Costs upon the settlement of their cases.

169. Hussin also discovered in addition to Sara's settlement, Lemberg failed to pay Hussin in a number of other settlements. Even before Hussin left the Firm, Lemberg had not been paying Hussin the agreed upon fee.

170. Sometimes Lemberg paid Hussin a lower percentage fee than what was agreed upon.

171. Sometimes, Lemberg paid Hussin no fee at all for cases in which Hussin was entitled to a fee.

172. In addition to unlawfully assessing costs to client settlements, and failing to pay Hussin the agreed upon fee, Lemberg also engaged in the unauthorized practice of law.

173.    Lemberg represented to Hussin he might refer new California to Hussin's firm, but said he was unsure whether he wanted to maintain a presence in California. Lemberg told Hussin he was not advertising in California since she had left the Firm.

174.    Despite Lemberg's representations, Lemberg continued to solicit and retain California clients while using Hussin's name as his California attorney. Lemberg advertised to former California clients via email after Hussin left the firm and without having a California attorney, and each of Lemberg's websites continued to identify Hussin as Lemberg's California attorney.

175.    While holding Hussin out as his California attorney, Lemberg solicited and retained new California clients and used non-California attorneys to achieve pre-litigation settlements on their behalf. The complaints presented to potential defendants and/or opposing counsel did not include allegations of California state law violations for which Californian's could be entitled to additional recovery, depriving Californians of potential additional recovery.

176.    Lemberg filed California clients' claims in other states in which either he or another member of the Firm were licensed. In doing so, Lemberg used improper jurisdictional bases, sometimes using jurisdiction based on a law firm's address. The complaints were devoid of California state law violations, depriving Californians of the potential for additional recovery.

177.    Hussin also discovered Lemberg's staff did not provide Hussin's contact information for consumers who called Lemberg's firm attempting to reach Hussin. Lemberg failed to instruct his staff, as he was required to do under applicable rules, to advise the callers Hussin was no longer with the Firm and to provide the callers with Hussin's contact information. Lemberg's staff instead fielded the calls as if they were new potential clients.

178.     In one such case, Lemberg filed a complaint in Nebraska after a client, Eric "Doe" ("Eric") had requested to speak to Hussin in regards to legal services. Lemberg's staff did not advise Eric that Hussin was no longer with the Firm and did not provide Eric with Hussin's contact information.

179.     Instead, Lemberg's staff provided a link to Eric to send information to the Firm and promised to give the information to Hussin. In clicking on the link to send additional information to the Firm, Eric unknowingly sent the Firm a Request for Legal Services.

180.     Eric continued to attempt to locate Hussin and discovered her correct contact information. Eric contacted Hussin and entered into a signed fee agreement for Hussin's services.

181.     Unbeknownst to Eric, Lemberg filed a complaint on Eric's behalf in Nebraska. Lemberg had not interviewed Eric prior to filing the complaint, and Lemberg was unaware of facts essential to the viability of Eric's complaint.

182.     Lemberg was ultimately forced to dismiss the complaint after Eric insisted he never retained Lemberg or his Firm to represent him.

183.     On May 30, 2014, Hussin emailed Lemberg and confronted him with all of her findings of wrongdoings. In an email, Hussin identified in detail each of Lemberg's unfair and unlawful acts. Hussin demanded in the email that Lemberg reimburse her clients for any charges which were not incurred by Lemberg, and insisted that Lemberg provide her with an accounting of what was owed to Hussin. Hussin also advised Lemberg in the email she was no longer comfortable sponsoring Lemberg in the Horton Class Action and demanded his withdrawal from the case.

184.    In response to Hussin's email, Lemberg threatened Hussin and wrote: "I'm going to sue you and squeeze you like the cockroach that you are. For every penny you've got."

185.    Lemberg repeatedly demanded that Hussin, not Lemberg, withdraw from the Horton Class Action. Lemberg continued to verbally assault Hussin in emails, telling Hussin: "I'm going to "ruin you," "bankrupt you," and likened her to a "dead cat."

186.    Lemberg's threats caused Hussin to fear for her personal safety and caused Hussin great distress.

187.    Lemberg continued to threaten Hussin and demand that she withdraw from the Horton Class Action.

188.    Lemberg repeatedly assured Hussin if she withdrew from the Horton Class Action, she would receive her 20% entitlement to the attorney's fee if and when the case resolved.

189.    Hussin determined the only way to obviate Lemberg's threats was to withdraw from the Horton Class Action.

190.    Hussin contacted Horton to advise him she was withdrawing from the case.

191.    Horton did not wish to continue with the class action without Hussin's involvement, and expressed his desire that Hussin transfer the class action to Hussin Law.

192.    Inasmuch as Hussin continued to fear for her personal safety, Hussin convinced Horton to remain with Lemberg's firm.

193.    On June 12, 2014, Lemberg again demanded Hussin get out of the Horton Class Action. Lemberg wrote: "You will still get your 20% but I don't want any dealings with you on that case."

194.    Based on Lemberg's assurance and fear for her personal safety, Hussin thereafter withdrew from Horton Class Action.

195.    Due to Lemberg's repeated instances of charging improper costs to client settlements and failing to pay Hussin in accordance in accordance with the terms of their agreement, Hussin made the unilateral decision to process all future settlements thru Hussin's firm.

196.    Hussin advised Lemberg of such, and told Lemberg that she would hold the funds until such time as Lemberg reimbursed all clients who were charged an unlawful cost and provided Hussin with an accounting of the cases in which Hussin was not paid the agreed upon fee. Hussin said in the June 8th email to Lemberg: "Moving forward, I will be processing the Lemberg CA settlements thru my firm. I will advise you of each matter which resolves and request that you provide me paid receipt for any costs incurred by Lemberg. Until such time as I am provided with a proper accounting and we are able to resolve our disputes, I will hold 40% of each settlement fee in a separate account."

197.    Hussin did exactly what she promised in the email.

198.    Hussin did in fact open a separate account, entitled "Lemberg Escrow," and began to deposit Lemberg's portion of the proceeds plus Lemberg's costs into the Lemberg Escrow account.

199.    Hussin did in fact email Lemberg and his bookkeeper each time a Lemberg matter settled, and requested actual costs.

200.    In response to each request, Lemberg's bookkeeper responded by providing Hussin with the actual costs on each settled matter.

201.    Interestingly, Lemberg never added a PrivacyStar cost to any of the PrivacyStar Clients' settlements when Hussin requested costs.

202.    Upon processing the Lemberg settlements, Hussin deposited Lemberg's portion of the funds plus his costs into the Lemberg Escrow bank account.

203.    Hussin also periodically provided Lemberg with an accounting for Lemberg and an update on cases which she settled. Hussin sent Lemberg an xls sheet with a list of settled cases with the settlement amounts, and provided Lemberg with a breakdown of the settlement proceeds. With each update sent to Lemberg, Hussin identified the amount of each settlement which had been deposited into her Lemberg Escrow bank account.

204.    Throughout 2014, Hussin sent repeated emails to Lemberg in an attempt to come to a resolution. Hussin repeatedly asked for an accounting of settled cases, and repeatedly demanded Lemberg reimburse the funds unlawfully charged to the clients.

205.    To this date, Lemberg has never reimbursed the clients and never provided Hussin with an accounting of what he owes Hussin.

206.    On December 31, 2014, Hussin remitted a check to Lemberg in the sum of $14,958.80, representing Lemberg's actual costs incurred on all the Lemberg matters Hussin settled in 2014.

207.    In July of 2014, Hussin reported Lemberg's aforementioned misconduct to the State Bar of California.

208.    After conducting an investigation, the State Bar of California concluded Lemberg may have violated Professional Rules, and forged Hussin's name on settlement documentation.

209.   The State Bar of California further determined that it had limited jurisdiction over Lemberg, and therefore in December of 2014, referred the matter to the Connecticut Statewide Grievance Counsel for further investigation.

210.   The Connecticut Statewide Grievance Committee conducted an investigation, and determined it was appropriate to refer the matter to the Judicial Grievance Panel. The Grievance Panel investigation is currently ongoing.

211.   Upon information and belief, two of Hussin's clients have also submitted a complaint to the Connecticut Statewide Grievance Committee. One such complainant is Brittany Dixon. The other complainant was charged an Administrative Cost by Lemberg despite the fact that Lemberg incurred no costs in resolving her claim.

212.   In May of 2015, Lemberg called Horton to advise him the Horton Class Action was likely to settle on a class wide basis.

213.   Horton told Lemberg he did not want to proceed with the case unless Lemberg agreed to pay Hussin 20% of the fees recovered in the Horton Class Action.

214.   Lemberg thereafter emailed Hussin, accusing her of interfering with the Horton Class Action.

215.   Hussin responded to Lemberg, telling him in an email that she was proud of Horton for sticking up for Hussin, especially inasmuch as she is in fact entitled to 20% of the fees that might be recovered in the Horton Class Action.

216.   Since Hussin withdrew from the Horton Class Action in July of 2014, Lemberg had stopped all his threats to bankrupt and injure. Immediately upon  Hussin recently reasserting her 20% interest in the Horton Class Action, Lemberg renewed his threats to sue Hussin..

217.     As Hussin never intended to relinquish her 20% interest and Lemberg had assured Hussin she would keep her 20% if she withdrew, Hussin refused to back down and asked Lemberg to confirm Hussin's entitlement to the Horton Class Action.

218.     Rather than concede Hussin's entitlement, Lemberg instead made good on his threat and filed this action against Hussin.

219.     Lemberg's assertions in his complaint are baseless and frivolous, and intended for the purpose of harassing and intimidating Hussin. Lemberg failed to mention all the things which led up to Hussin's refusal to pay Lemberg until such time as he reimbursed the clients and provided Hussin with an accounting.

220.     Lemberg knows his allegations of Hussin's wrongful conduct are untrue.

221.     Lemberg knows Hussin lacks the financial resources to litigate against Lemberg, and Lemberg filed the complaint in an effort to exhaust Hussin's financial resources.

222.     Lemberg is intentionally causing injury by virtue of his complaint, and causing Hussin to spend time away from her practice and spend money on defending his baseless allegations.

223.     Lemberg is a liar, a thief, and conducts his "consumer protection" practice with little regard for those he portends to protect, and has harmed his clients and Hussin by his unlawful acts.

## COUNT ONE
### (BREACH OF CONTACT)

224.     Defendants hereby incorporate by reference all of the above paragraphs of this Counter-Claim as though fully stated herein.

225. By virtue of the foregoing, Lemberg breached his agreement with Hussin in one or more ways, including but not limited to:

a.      By causing Hussin's signature to be affixed on settlement documentation without Hussin's knowledge or assent to do so;

b.      By failing to pay Hussin the proper percentage in some cases, failing to pay Hussin any fee whatsoever in some cases, failing to advise Hussin of settled cases, intentionally hiding settlements, and not paying Hussin the agreed upon fee;

c.      By charging clients a $595 "PrivacyStar Cost" which Lemberg had not incurred, and as a result causing injury to Californians who Hussin seeks to protect.

d.      By charging clients "Administrative Costs" which Lemberg had not incurred, and which costs were not discussed with or agreed upon by the clients, and as a result causing injury to Californians who Hussin seeks to protect;

e.      By ignoring Hussin's repeated demands to reimburse clients whose settlements were reduced by costs not incurred;

f.      By deducting non-existent costs from client settlements which Lemberg had not incurred, causing Hussin's share of the legal fees to be decreased;

g.      By deducting costs from client settlements which Lemberg had not incurred, and causing injury to Hussin's reputation as a result of her affiliation with Lemberg;

h.      By referring a large number of PrivacyStar Clients to Hussin who were unaware of legal representation, unaware they had spoken to a law firm, unaware they had requested legal services, unaware they were speaking to a law firm, had not signed

fee agreements, and were shocked to learn they had a lawyer or a law suit when Hussin called to introduce herself;

      i.     By instructing paralegals to notate Prolaw to indicate they had spoken with new clients and confirmed the facts prior to drafting complaints when in fact the client had not been contacted, causing Hussin to file complaints on behalf of Californians who were unaware of legal representation;

      j.     By failing to disclose to Hussin the unlawful manner in which Lemberg solicited and retained PrivacyStar Clients despite repeated inquiries as to propriety of Lemberg's practices;

      k.     By refusing to cooperate in a cost efficient manner in which Hussin could transfer her files to her new database, causing Hussin to waste hundreds of hours and thousands of dollars to manually transfer Hussin's files;

      l.     By forcing Hussin to agree to a usurious and unethical referral fee of 40%;

      m.     By forcing Hussin to agree to a usurious and unethical referral fee of 40% for cases in which Lemberg's firm had little to no involvement;

      n.     By forcing Hussin to agree to a usurious and unethical referral fee of 40% while refusing to provide litigation or paralegal support and simultaneously causing Hussin to waste unnecessary money and time on manually transferring all of her files;

      o.     By forcing Hussin to agree to a usurious and unethical referral fee of 40% for cases in which Lemberg had no signed fee agreement;

      p.     By forcing Hussin to agree to a usurious and unethical referral fee of 40% for cases in which the "clients" had no knowledge of legal representation and/or no knowledge they had ever spoken to a law firm for the purpose of pursuing legal action;

q.      By taking cases back which Lemberg had referred to Hussin without advising or discussing the same with Hussin, causing Hussin to unnecessarily duplicate Lemberg's efforts, and then never paying Hussin a fee for the cases which settled;

r.      By threatening to injure and bankrupt Hussin after she disclosed her knowledge of Lemberg's wrongdoings, and causing Hussin to fear for her personal safety, and great worry and distress;

s.      By coercing Hussin into withdrawing from the Horton Class Action, while promising in writing Hussin would still get her 20%. Thereafter Lemberg refusing to acknowledge his written agreement regarding Hussin's entitlement to fees in the Horton Class Action, and then filing this suit in retaliation for Hussin recently asserting her entitlement;

t.      By engaging in the unauthorized practice of law, and soliciting and retaining Californians using Hussin's name as his California attorney, but not referring the cases to Hussin and/or not compensating Hussin for the use of her name;

u.      By failing to instruct his staff to advise callers asking to speak with Hussin that she is no longer with the firm and provide them with Hussin's new contact information, causing Hussin to miss out on lost business opportunities;

v.      By failing to provide Eric with Hussin's contact information and instead filing a complaint on Eric's behalf in Nebraska without his knowledge or assent to do so; and

w.      By telling Hussin he was no longer retaining or soliciting Californians, but secretly continued to solicit and retain Californians while advertising Hussin's name as his California attorney.

224.    Based on Lemberg's material breach, Hussin was excused in performing under the terms of her agreement with Lemberg.

225.    Based on Lemberg's material breach, Hussin was and is justified in processing settlements thru Hussin Law in order to protect her interests and the interests of Californians who Hussin sought to protect.

226.    Based on Lemberg's material breach, Hussin was and is justified in withholding funds due to Lemberg until such time as Lemberg reimburses Californians who were charged unlawful PrivacyStar charges and Administrative Costs.

227.    Based on Lemberg's material breach, Hussin was and is justified in withholding funds due to Lemberg until such time as Lemberg pays Hussin for each California settled case in which Hussin was not paid the proper percentage or was not paid at all.

228.    Based on Lemberg converting and hiding cases he had referred to Hussin, Hussin was justified in abandoning the rest of Lemberg's unfiled cases. Hussin wasted time and effort in prosecuting unfiled cases only to find Lemberg had taken the cases to her loss and damage.

229.    Based on Lemberg's material breach, Hussin was and in justified in withholding funds due to Lemberg until such time as it determined the amount of monies Lemberg owes to Hussin.

230.    Based on Lemberg's material breach, Hussin should not be obligated to pay Lemberg the usurious and unethical 40% referral fee for any cases.

231.    Based upon Lemberg's material breach, Hussin has been monetarily damaged, including but not limited to lost income, lost business opportunities, wasteful expenditure of time and unnecessary costs incurred in manually transferring thousands of unnamed documents, fear, distress, and damage to Hussin's reputation.

232.     Based on Lemberg's material breach, Hussin endured great distress and fear, and continues to be injured by Lemberg's frivolous claims against her.

## COUNT TWO
## (CUTPA)

233.     Defendants hereby incorporate by reference all of the above paragraphs of this Counter-Claim as though fully stated herein.

234.     As detailed above, Lemberg engaged in deceptive, illegal, immoral, unethical, and/or unscrupulous acts, all of which offend public policy and constitute unfair methods of competition and unfair trade practices in violation of the Connecticut Unfair Trade Practices Act, CGS. Sections 42-110a *et seq*. ("Cutpa"). More particularly:

    a.  Lemberg used deceptive and unlawful solicitation practices to contact and retain PrivacyStar Clients;

    b.  Lemberg engaged in deceptive, unlawful and unethical business practices by charging clients unauthorized costs which Lemberg did not incur;

    c.  Lemberg engaged in deceptive, unethical and unlawful business practices by charging "administrative fees" and PrivacyStar costs which were not incurred, previously disclosed to the client, nor agreed to in writing by the client;

    d.  Lemberg engaged in deceptive and unlawful practices by causing Hussin's name to be affixed on settlement documentation without her knowledge and assent and then not paying her a fee;

e.   Lemberg engaged in deceptive and unlawful practices by hiding settlements from Hussin in order to avoid paying Hussin the agreed upon fee; and

f.   Lemberg used deceptive, unethical and unlawful business practices by filing law suits on behalf of consumers who were unaware of legal representation; and

g.   Lemberg uses unethical and unlawful business practices by retaining "clients" without a signed fee agreement.

235.   Lemberg's practice of deducting costs from client settlements which were not authorized, incurred or agreed to not only caused to harm caused harm to Californians, but likely caused harm to Lemberg's "clients" nationwide who were likewise charged an unauthorized charge.

236.   Lemberg's unlawful and unethical practice of deducting costs from client settlements which were not authorized, incurred or agreed to not only caused financial harm to Californians, but also served to reduce the fee paid to Hussin, causing further financial harm to her.

237.   Upon information and belief, Lemberg's practice of deducting costs which he had not incurred from Californians is widespread in his firm, and it is likely Lemberg's clients in other states have been likewise aggrieved and financially harmed.

238.   Hussin suffered an ascertainable loss as a result of plaintiff's conduct, is entitled to injunctive relief, actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g and as set forth in the Prayer for relief herein.

239.   Pursuant to Conn. Gen. Stat. § 42-110g(c), Defendants provided a copy of their original Complaint to the Connecticut Attorney General and the Connecticut Commissioner of Consumer Protection.

**COUNT THREE**
**(CONVERSION)**

240.    Defendants hereby incorporate by reference all of the above paragraphs of this Counter-Claim as though fully stated herein.

241.    By Lemberg's conduct as aforesaid, Lemberg converted defendants' money and clients to his own use without defendants' consent all to Defendants' loss and damage.


**COUNT FOUR**
**(STATUTORY THEFT-TREBLE DAMAGES PER C.G.S. § 52-564)**

242.    Defendants hereby incorporate by reference all of the above paragraphs of this Counter-Claim as though fully stated herein.

243.    Lemberg's deduction of costs which were not authorized, incurred or agreed to from client settlements not only harmed Californians, but also served to reduce the fee paid to Hussin, causing further financial harm to her.

244.    By its conduct as aforesaid, Lemberg converted defendants' money and clients to his own use without defendants' consent all to Defendants' loss and damage.

245.    Such conduct constitutes statutory theft and/or larceny that gives rise to this cause of action, pursuant to C.G.S.A. § 52-564 (Treble Damages For Theft) and C.G.S.A. § 53a-119 (Larceny Defined).

246.    Pursuant to C.G.S.A. § 52-564, Defendant is entitled to and hereby requests relief in the nature of treble damages.

**COUNT FIVE**
**(*QUANTUM MERUIT*)**

247.    Defendants hereby incorporate by reference all of the above paragraphs of this Counter-Claim as though fully stated herein.

248.    Defendants performed all work on the Lemberg files with the reasonable expectation of being paid and terminated her relationship with Lemberg upon the reasonable expectation to be paid for work performed by her and cases settled by Lemberg on California Filed and Pre-Lit cases.

249.    Defendants are entitled to be paid the reasonable value of all unpaid work performed and all unpaid settlements, and Plaintiff has failed to so compensate the Defendants.

## COUNT SIX
## (UNJUST ERICHMENT)

250.    Defendants hereby incorporate by reference all of the above paragraphs of this Counter-Claim as though fully stated herein.

251.    Plaintiff has been unjustly enriched at defendants' expense by the conduct set forth above, all to Defendant's loss and damage as previously alleged.

252.    Defendant is entitled to be paid the reasonable value of all unpaid work performed and all unpaid settlements, and Plaintiff has failed to so compensate the Defendant.

## COUNT SEVEN
## (ABUSE OF PROCESS)

253.    Defendants hereby incorporate by reference all of the above paragraphs of this Counter-Claim as though fully stated herein.

254.    The process issued in this case, to wit, the summons and complaint, were issued on behalf of plaintiff against defendants without probable cause and with the specific intention,

as alleged above, of not seeking the relief set forth in the Complaint, but as a guise to attempt to improperly scare and stop Hussin from asserting her entitlement in the Horton Class Action, and to bankrupt and cause Hussin financial ruin, and to generally harass, annoy, embarrass, and cost defendant sums to defend the action, all of which purposes are improper purposes for issuing process.

255.    As a result of such abuse of process, defendants have been harmed.

WHEREFORE, DEFENDANTS CLAIM:

1.  An Order from the Court directing Lemberg to reimburse all Administrative Costs and PrivacyStar Costs which were charged to any client nationwide and which Lemberg did not incur, under the injunction provisions of CUTPA;

2.  An Order enjoining Lemberg from charging Administrative Costs or other costs unless agreed upon in writing in a signed fee agreement under the injunction provisions of CUTPA;

3.  An Order directing Lemberg to obtain a signed fee agreement from each and every client the Firm retains nationwide under the injunction provisions of CUTPA;

4.  Money Damages for fees which were due to Hussin but not properly paid or not paid at all;

5.  Money Damages for costs incurred in the manual transfer Hussin's files to her new database;

6.  Costs and Pre and post-judgment interest;

7.  Punitive damages and attorney's Fees pursuant to CGS Sections 42-110a, *et seq.*

8.  Treble damages pursuant to CGS 52-564; and

9.  Such other relief as the court deems just and proper.


THE HUSSIN LAW OFFICES, P.C.

By:  /s/ Craig S. Taschner
        Craig S. Taschner, Esq.
        Polivy & Taschner, LLC
        Six Central Row, 2nd Floor
        Hartford, CT 06103
        (860) 560-1180
        bar no. ct02595
        CTASCHNER@AOL.COM


TAMMY HUSSIN

By:  /s/Tammy Hussin
Pro Se
Hussin Law
6404 Merlin Dr.
Carlsbad, CA  92011
Telephone:  877-677-5397
Facsimile:  877-667-1547
Tammy@HussinLaw.com

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on September 18, 2015, a copy of foregoing Answer, Affirmative Defenses and Counterclaim was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF System.

By: <u>/s/ Craig S. Taschner</u>
Craig S. Taschner, Esq.
Polivy & Taschner, LLC
Six Central Row, 2nd Floor
Hartford, CT 06103
(860) 560-1180
bar no. ct02595
CTASCHNER@AOL.COM